NO. 07-04-0591-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL E

MARCH 1, 2006

_____

BOBBIE ADAMS HENSARLING, Individually and as Executrix of the
Estate of CHARLES HENSARLING, CHERYL ANN JENNINGS, KEITH RANDALL
HENSARLING, and CATHERINE BETH BRANSON,

APPELLANTS

v.

COVENANT HEALTH SYSTEM d/b/a COVENANT MEDICAL CENTER
and COLLIN LANGLITZ,

APPELLEES

_____

FROM THE 99TH DISTRICT COURT OF LUBBOCK COUNTY;

NO. 2002-520,034; HON. MACKEY HANCOCK, PRESIDING

_____

Before REAVIS and CAMPBELL, JJ., and BOYD, S.J.[1]

**MEMORANDUM OPINION**

Appellant Bobbie Adams Hensarling, individually and as executrix of the estate of

Charles Hensarling, Cheryl Ann Jennings, Keith Randall Hensarling, and Catherine Beth

Branson (collectively referred to as Hensarling) appeal from an order striking their medical

_____

[1]John T. Boyd, Chief Justice (Ret.), Seventh Court of Appeals, sitting by assignment.
Tex. Gov't Code Ann. §75.002(a)(1) (Vernon Supp. 2005).

expert and granting summary judgment to appellees Covenant Health System d/b/a Covenant Medical Center (Covenant) and Collin Langlitz (Langlitz) with respect to Hensarling's claims for health care liability. The granting of summary judgment was premised on the fact that without the testimony of Dr. Lawson Bernstein, Hensarling could not raise a fact issue on the causation element of the claims. Therefore, the issue before us is whether the trial court acted properly in striking Bernstein as an expert witness because he was not qualified to testify on the element of causation. We affirm the judgment of the trial court.

## Background

Charles Hensarling was admitted to Covenant on August 8, 2000, with a subarachnoid hemorrhage. Successful surgery was performed with respect to that condition. However, Charles remained in the hospital for the next three weeks suffering from complications such as pneumonia, respiratory failure, intermittent atrial fibrillation, central line sepsis, deep vein thrombosis, and confusion. He was in intensive care until September 1, at which time he was transferred to a regular room.

Around 11:45 that evening, Charles became agitated. Langlitz, the nurse on duty, gave him a five mg. dose of Haldol intravenously pursuant to the order of Dr. Matthew Wills. Shortly thereafter, Charles' oxygen saturation decreased to 60. Langlitz called Wills' office and spoke to his nurse practitioner, who arrived at the hospital. Thereafter, Charles was transferred back to intensive care and was intubated by Dr. Larry Warmoth. His respiratory problems improved for a while but several hours later, his condition deteriorated and he died around 6:30 a.m.

2

Hensarling sued the hospital, Langlitz, and Wills, alleging that Charles died as a result of an adverse reaction to Haldol which Langlitz failed to recognize and treat.[2] In support thereof, Hensarling submitted the expert report of Bernstein. The defendants moved to dismiss the lawsuit, alleging Bernstein was not qualified to render the opinions he gave in his report. The trial court initially denied the motions. However, the defendants again moved to strike Bernstein as an expert and moved for summary judgment. The trial court granted the motion on the basis that Bernstein was not qualified to render an opinion on causation.

**Standard of Review**

A witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion. TEX. R. EVID. 702. However, a licensed doctor is not automatically qualified to testify as an expert on every medical question. *Broders v. Heise,* 924 S.W.2d 148, 152 (Tex. 1996); *Cresthaven Nursing Residence v. Freeman,* 134 S.W.3d 214, 233 (Tex. App.--Amarillo 2003. no pet.). Nevertheless, an expert may be qualified to testify even though he is not a specialist in the particular branch of medicine for which the testimony is offered, *Blan v. Ali,* 7 S.W.3d 741, 745 (Tex. App.--Houston [14th Dist.] 1999, no pet.), as long as he has sufficient familiarity with the specific subject matter. *Broders v. Heise,* 924 S.W.3d at 153. Thus, the trial court must measure the doctor's expertise against the opinion being offered. *SunBridge Healthcare Corp. v. Penry,* 160 S.W.3d 230, 237 (Tex. App.--Texarkana 2005, no pet.); *Marvelli v. Alston,* 100 S.W.3d 460, 474 (Tex. App.--Fort Worth 2003, pet. denied). The offering party has the

---

[2]Wills was later dismissed from the lawsuit.

burden to establish that the witness is qualified, *Gammill v. Jack Williams Chevrolet, Inc.,* 972 S.W.2d 713, 718 (Tex. 1998), and we review the trial court's decision to strike the testimony of an expert for abuse of discretion. *Broders v. Heise,* 924 S.W.2d at 151.

**Analysis**

Bernstein's curriculum vitae represents that he maintains a practice in "[f]orensic & [n]europsychiatric consulting . . . with expertise in the assessment and treatment of closed head injuries, stroke, toxic environmental exposure, chronic pain conditions and other neurological/neuropsychiatric conditions." He testified at his deposition that he practices "in the realm of neuropsychiatry, which is the practice of psychiatry when it's interfaced with neurology, internal medicine and . . . neurotoxicology." The primary focus of his practice is on the pharmacological management of those problems, which includes prescribing drugs such as Haldol and the effects of those drugs. He did his residency in general psychiatry and is board certified by the American Board of Psychiatry and Neurology in psychiatry and by the American College of Forensic Medicine in forensic psychiatry. He also teaches neuropsychiatry and trains neurosurgeons in identification and management of drug and alcohol withdrawal and the identification and management of adverse neurological sequelae from that condition, management of delirium, and informed consent issues. The gist of his opinion on causation was that the Haldol caused a dystonic reaction, the dystonic reaction caused respiratory distress, the respiratory distress caused a period of hypoxia, the hypoxia produced ARDS (acute respiratory distress syndrome) and the

4

ARDS caused the death of Charles. However, Dr. Warmoth, who signed the death certificate, determined the cause of death to be a pulmonary embolism.[3]

Bernstein testified that in terms of management of ARDS, he has provided neuropsychiatric management for patients that have ARDS in the hospital but leaves the management of the ARDS itself in the hands of specialists. He has had the opportunity to diagnose ARDS on his own but rarely does so. Further, if he suspected that a patient had a pulmonary embolus, he would bring it to the attention of the team of physicians he works with but would not generally be the one to provide the treatment, although he has diagnosed pulmonary embolus probably over a hundred times in his career. Bernstein conceded that pulmonologists have more training than he does in matters related to the lungs but contended that, under this unique set of circumstances, his experience and training are equivalent to those of a pulmonologist. Generally in his practice, he is not asked to determine the cause of death.

General experience in a specialized field is not sufficient to qualify a witness as an expert. *Reed v. Granbury Hosp. Corp.,* 117 S.W.3d 404, 410 (Tex. App.--Fort Worth 2003, no pet.). It must be shown that the doctor possesses special knowledge as to the very matter on which he proposes to give an opinion. *Keo v. Vu,* 76 S.W.3d 725, 731 (Tex. App.-- Houston [1st Dist.] 2002, pet. denied). Bernstein's theory of causation involved a sequential series of conditions stemming initially from a reaction to Haldol and ultimately leading to his death. However, several steps in that sequential series involved the development of specific pulmonary conditions which could develop without a reaction to

---

[3] Without an autopsy, which the family apparently declined, this cause of death cannot be confirmed.

Haldol. While Bernstein had specific experience with the administration of Haldol and its effects, the record shows he had general experience with both ARDS and pulmonary embolus in terms of providing psychiatric assistance to patients suffering from those problems. The trial court could have found that Bernstein did not have the specialized knowledge necessary to establish the element of causation.

Hensarling relies heavily on our opinion in *Cresthaven Nursing Residence v. Freeman,* 134 S.W.3d 214 (Tex. App.--Amarillo 2003, no pet.) for the proposition that "the opinions of other doctors who agree with the expert in question are relevant to evaluating the expert's qualifications and the reliability of his opinions." However, we noted the cause of death offered by other doctors in that case only for the purpose of showing that the opinions offered did not require an expertise peculiar to the fields of cardiology or urology in determining that the trial court did not abuse it discretion in admitting the testimony. *Id.* at 234. Whether or not we might have decided the matter differently from the trial court is not the test. The propriety of the trial court's admission or exclusion of expert testimony is tested against an abuse of discretion which means whether the court acted without reference to guiding principles or rules. *Daniels v. Vance,* 175 S.W.3d 889, 894 (Tex. App.--Texarkana 2005, no pet.); *Keo v. Vu,* 76 S.W.3d at 730. We cannot find that it did so here.

Without the testimony of Bernstein on causation, Hensarling has failed to produce more than a scintilla of evidence to defeat the no-evidence motion for summary judgment.[4] *See Crocker v. Paulyne's Nursing Home, Inc.,* 95 S.W.3d 416, 423 (Tex. App.--Dallas 1992, no writ). Accordingly, we must and do affirm the judgment of the trial court.

---

[4]The standard of review for a no-evidence motion for summary judgment is fully discussed in *Kimber v. Sideris,* 8 S.W.3d 672, 674-75 (Tex. App.--Amarillo 1999, no pet.).

John T. Boyd
Senior Justice